UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
LOIS ANN MORRIS,

                Plaintiff,

- against -

NYC HRA, ADULT PROTECTIVE SERVICES,
VILLAGE CARE, and JAMAICA HOSPITAL,

                Defendants.
------------------------------------------------------------X

**MEMORANDUM AND ORDER**
13-CV-1845 (RRM) (MDG)

ROSLYNN R. MAUSKOPF, United States District Judge.

Plaintiff Lois Ann Morris, proceeding *pro se*, filed the instant action pursuant to 42 U.S.C. § 1983 ("Section 1983") against two New York City agencies and two private organizations. The Court granted plaintiff's application to proceed *in forma pauperis*, dismissed the original complaint *sua sponte* for failure to state a claim, and granted plaintiff leave to file an amended complaint within 30 days identifying the individual defendants who allegedly violated her civil rights. (June 19, 2013 Order (Doc. No. 4).) Plaintiff filed an Amended Complaint on August 19, 2013, naming the same four entity defendants from the dismissed complaint. (Am. Compl. (Doc. No. 6).) For the reasons that follow, the Amended Complaint is DISMISSED *sua sponte*. In light of plaintiff's *pro se* status, the Court grants plaintiff a final opportunity to amend the complaint consistent with this opinion within 30 days from the date of this Memorandum and Order.

## BACKGROUND

### I. The Amended Complaint

In her Amended Complaint, plaintiff makes the following allegations, which the Court takes as true for purposes of this Memorandum and Order:

On an unspecified date, and at plaintiff's request, social worker "Alla Of-Josa" referred plaintiff to Adult Protective Services ("APS") for help in an eviction proceeding in housing court. (*Id.* at 3.[1]) Contrary to plaintiff's wishes, and while the housing court action was pending, APS caseworker Roseann Marshall made plans to move plaintiff to a shelter. (*Id.*) Plaintiff was told to call a certain telephone number to arrange for shelter staff to pick her up. (*Id.*) Plaintiff refused because she did not want to lose her housing or become a "victim" of "heavy cleaning," which is the "indiscriminate throwing away of all of a person's possessions." (*Id.*) APS workers pressured plaintiff to undergo a psychiatric evaluation as a condition of remaining an APS client. (*Id.* at 4.) Plaintiff mentioned this pressure to both Ed Mario, a lawyer at Queens Legal Services for the Elderly, and "Ms. Sebastian," an APS worker. (*Id.* at 3–4.) Plaintiff missed two appointments for psychiatric evaluations. (*Id.* at 4.) APS's only complaint against plaintiff was that her apartment contained too many books and papers. (*Id.* at 4–5.) Plaintiff could not afford to place her books and papers into storage and attempted, through various APS workers, including administrator Andrew Hearn, to get a "private storage grant" for her possessions, but was refused. (*Id.* at 5.) Instead, APS offered plaintiff a furniture grant, which plaintiff could not easily use. (*Id.*)

Both Hearn and an APS case worker advised plaintiff not to attend an appearance in housing court, as the case worker would appear on plaintiff's behalf. (*Id.*) Later in the day, however, an APS case manager "suddenly" wanted plaintiff to go to court, which plaintiff refused to do, as plaintiff believed her attendance was unnecessary. (*Id.* at 6.) Soon afterwards, on an unspecified date in March 2011, plaintiff returned home to find the locks to her apartment

---

[1] Because the Amended Complaint contains both statements outside of the enumerated paragraphs and instances of duplicate paragraphs numbers, the Court cites to page numbers within the Amended Complaint.

changed. (*Id.*) Subsequently, plaintiff saw "a legal paper claiming she had forfeited in court by not attending" the hearing. (*Id.*)

APS then told plaintiff to come to housing court on April 4, 2011 with her financial records. (*Id.* at 7.) When she arrived, she was surprised by an APS lawyer and a nurse "whose last name may have been Sorrell." (*Id.*) The nurse pressured plaintiff to undergo a psychiatric evaluation, which she refused. (*Id.*) The lawyer handed plaintiff papers, which plaintiff initially believed were related to her housing court case but later discovered was a mental health warrant. (*Id.* at 8.) Plaintiff, not realizing at the time that the document was a mental health warrant, continued to refuse psychiatric evaluation and walked out of the "APS office." (*Id.*) Almost immediately, a "light-skinned likely Caucasian uniformed man who may have been a police officer" handcuffed plaintiff and took her to a cell. (*Id.*) Eventually, under threat of being sent to a "mental ward" to undergo a psychiatric evaluation, plaintiff gave "forced consent" to undergo a psychiatric evaluation. (*Id.*)

Although plaintiff was told the evaluation would take forty-five minutes and had not said anything "dramatic," an ambulance arrived about five minutes into the evaluation. (*Id.* at 9.) Plaintiff was then taken by uniformed personnel, handcuffed and against her will, to a locked psychiatric ward at Jamaica Hospital. (*Id.*) Plaintiff remained involuntarily committed at the hospital for the next eleven days. (*Id.* at 2.) During her commitment, plaintiff was subjected to involuntary psychiatric evaluations, some by individuals plaintiff believes lacked proper active certification. (*Id.*) Although plaintiff made multiple requests to speak to a lawyer, she was not allowed to until either the third or fourth day of her commitment. (*Id.* at 11.) Additionally, plaintiff was denied the ability to place phone calls for stretches of time as long as seventeen hours. (*Id.*) Plaintiff's request for a copy of her rights was denied. (*Id.* at 16.) Her civilian

clothing was confiscated. (*Id.* at 27.) She was also not allowed to attend religious services with other patients, was not advised of the availability of medical and dental clinics, and was not permitted to have a pencil and paper. (*Id.* at 23, 27.) Plaintiff does not identify any specific medical or dental needs that required attention during her commitment. While at the hospital plaintiff had access to only a single unisex toilet and shower unit which she shared with twenty to thirty other individuals, was given a bed with chains under the sheets, and was housed in what she calls a "reverse cage" with staff "housed in a large plexiglas[s] box." (*Id.* at 24.) During her commitment, hospital staff told her on several occasions that she did not have a home to return to upon her release, however an APS caseworker she spoke to on the phone told her that "her housing was safe while she was in the hospital." (*Id.* at 20.) Hospital staff asked plaintiff to identify her next of kin, but because plaintiff's mother was an octogenarian, she provided the name of her sister and asked that she not be contacted. (*Id.* at 21.) The hospital staff contacted her sister anyway. (*Id.*) After her release, plaintiff wished to review her hospital chart but felt too intimidated to go to the APS office to review it. (*Id.* at 19.) As a result of plaintiff's commitment, her landlord and neighbors treat her differently, her brother has refused to let her return to the family home she grew up in ("a critical safety net"), and APS has contacted other organizations and agencies about her. (*Id.* at 10, 24.)

Plaintiff was able to inspect the mental health warrant only after several days in confinement, upon which inspection she discovered it was based on an unidentified APS caseworker's affidavit, "the crux of which was that the plaintiff had too many books and papers in her apartment," and "gave the impression that the plaintiff had trash piled to the ceiling while she in fact instead had several filing cabinets in the apartment and designer plastic stack crates." (*Id.* at 12–13.) The affidavit referenced only one additional person, "Dietrich," a worker at a rent

4

grant agency, who told the unidentified APS worker that plaintiff acted "inappropriately." (*Id.* at 13.)

In her Amended Complaint, plaintiff invokes an array of constitutional protections, (*see e.g.*, *id.* at 2, 7), asserts that APS failed in its duty to care for her welfare, (*id.* at 9), and asserts that defendants violated her rights under the Americans with Disabilities Act ("ADA"), (*id.* at 26), Section 504(a) of the Rehabilitation Act, (*id.*), and the New York Mental Hygiene Law, (*id.* at 12, 16, 17, 23). Plaintiff also appears to assert a facial challenge to the New York Mental Hygiene Law. (*See e.g.*, *id.* at 25 ("The plaintiff believes that the severe curtailment of liberty and overriding of other US constitutional rights . . . were much due to flaws in the NYS Mental Hygiene and other NY law.").)

## DISCUSSION

### I. Standard of Review

The Court is required to dismiss a complaint filed *in forma pauperis* if the Court determines that it "(i) is frivolous or malicious, (ii) fails to state a claim upon which relief may be granted, or (iii) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). Federal Rule of Civil Procedure 8(a), which governs pleadings, requires a plaintiff to provide (1) a short and plain statement of the grounds for the court's jurisdiction; (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and (3) a demand for relief. Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content

5

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

While *pro se* complaints must still contain sufficient factual allegations to meet the plausibility standard, *see Harris v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009), the Court reviews such allegations with "special solicitude" and interprets the allegations to raise the "strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474–75 (2d Cir. 2006) (*per curiam*) (internal quotation marks and citations omitted); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007). If a liberal reading of the pleading gives any indication that a valid claim might be stated, the court must grant leave to amend it. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

## II. Section 1983 Claims

Plaintiff's constitutional claims fall under 42 U.S.C. § 1983, which "provides 'a method for vindicating federal rights elsewhere conferred,' including under the Constitution." *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). "In order to maintain a section 1983 action, two essential elements must be present: (1) the conduct complained of must have been committed by a person acting under color of state law; and (2) the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994) (citing *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986). "Color of law," in the context of a section 1983 claim, means under the "'pretense' of law." *Id.* at 547–48 (quoting *Screws v. United States*, 325 U.S. 91, 111 (1945)). A municipality may be found liable under section 1983 only if a plaintiff can show that a municipal policy or custom caused the deprivation of his or her rights.

6

*See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978). Proof of a single incident of unconstitutional activity is not sufficient to impose liability on a municipality unless the plaintiff also shows that the incident was caused by an existing, unconstitutional municipal policy that can be attributed to a municipal policymaker. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985).

This Court dismissed all claims in plaintiff's original complaint against each defendant and granted plaintiff leave to amend on June 19, 2013. (June 19, 2013 Order.) The Court dismissed the claims, in part, because plaintiff had "not named any individual defendants who could be held liable for the alleged deprivation of her constitutional rights."[2] (*Id.* at 5–6.) Further, although the City of New York itself is a suable entity, the Court declined to substitute the City because the complaint did not allege that the City of New York, through its Social Services agencies, has adopted any unconstitutional policy that deprived plaintiff of her rights. (*Id.* at 6.)

In her Amended Complaint, plaintiff names the exact same four defendants – two public agencies, the New York City Human Rights Administration ("HRA"), Adult Protective Services, and two private entities, Village Care and Jamaica Hospital. (Am. Compl.) Against these defendants, the Amended Complaint is dismissed for the same reasons stated in the June 19, 2013 order. Although plaintiff "consents" to having the Court substitute the City of New York as a defendant in her Amended Complaint, plaintiff has still not identified any unconstitutional city policy that resulted in the alleged deprivation of her rights, asserting only generally and in a

---

[2] The New York City Charter provides that suits "shall be brought in the name of the City of New York and not in that of any agency." N.Y. City Charter § 396; *see also Jenkins v. City of New York*, 478 F.3d 76, 93 n.19 (2d Cir. 2007). Moreover, private entities, such as Village Care and Jamaica Hospital, are not ordinarily amenable to suits for damages pursuant to Section 1983. *Robinson v. Long Island Jewish Hosp.*, No. 14-CV-3344 (NGG) (JMA), 2014 WL 4175790, at *2 (E.D.N.Y. Aug. 20, 2014) (citing *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999); *Kia P. v. McIntyre*, 235 F.3d 749, 755–56 (2d Cir. 2000)).

7

conclusory manner that "New York Law overr[ode] so many constitutional rights," and that she believes her constitutional rights were curtailed "due to flaws in NYS Mental Hygiene and other law."[3] (*See id.* at 14, 25, 29.) Accordingly, the Court again declines to substitute the City of New York as a defendant.

The June 19, 2013 Order also invited plaintiff to identify and name individual defendants who could be held liable for the alleged violations of her civil rights under Section 1983 and provided her with instructions for how to do so in the event that she could not identify them by name. (June 19, 2013 Order at 7, 7 n.2.) Although the Amended Complaint does identify several individuals, it does not name any individuals as defendants and does not articulate a theory of liability as to the specific identified individuals. It is therefore unclear what, if any, claims plaintiff intends to raise against any specific individuals. Mindful of plaintiff's *pro se* status, the Court grants plaintiff one final opportunity to amend her complaint to name as defendants any specific individuals and identify a basis for liability against each such defendant.

### III. Additional Claims

Plaintiff also asserts claims under the ADA, Section 504(a) of the Rehabilitation Act, and the New York Mental Hygiene Law.

The Amended Complaint alleges that the defendants discriminated against plaintiff under the ADA and the Rehabilitation Act "due to her medical conditions and perception of being mentally disabled." (Am. Compl. at 25–27.) Both the ADA and the Rehabilitation Act prohibit discrimination "by reason" of an individual's disability. 29 U.S.C. § 794(a); 42 U.S.C. § 12132.

---

[3] Even construing plaintiff's claim as a facial challenge to the New York *State* Mental Hygiene Law, the Second Circuit has concluded that the law's provisions for challenging an involuntary civil commitment fall "within the bounds of procedural due process." *Project Release v. Prevost*, 722 F.2d 960, 975 (2d Cir. 1983); *see also Olivier v. Robert L. Yeager Mental Health Ctr.*, 398 F.3d 183, 188 (2d Cir. 2005) (concluding that New York's statutory scheme governing involuntary commitments "facially satisfies Fourteenth Amendment due process requirements.")

8

Courts generally apply the same legal standards to claims arising under both of these acts. *See Bryant v. Steele*, 25 F. Supp. 3d 233, 242 (E.D.N.Y. 2014) (citing *Harris*, 572 F.3d at 73). "[U]nless one of [the] subtle distinctions" between the two acts "is pertinent to a particular case, the Court treats claims under the two statutes identically." *Id.* (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)). Under these acts, discrimination claims are not actionable unless "the individual's handicap is unrelated to, and thus improper to consideration of, the services in question." *McGugan v. Aldana–Bernier*, 752 F.3d 224, 233 (2d Cir. 2014) (quoting *United States v. University Hospital*, 729 F.2d 144, 156 (2d Cir. 1984)). In the instant case, those paragraphs of the Amended Complaint that assert ADA violations allege improper involuntary hospitalization, "coercive evaluations," denial of counsel, denial of medical and dental care, and denial of religious services.[4] (*See* Am. Compl. at 25–26.) Questions over the propriety of plaintiff's hospitalization and mental health evaluations are related to the subject of plaintiff's actual or perceived disability and treatment and are thus not actionable under the ADA or the Rehabilitation Act. With respect to denial of counsel, medical and dental care, or religious services, to the extent these do not arise by virtue of the necessity and nature of her commitment, the Amended Complaint fails to articulate how she was subjected to such treatment "by reason" of her disability. The Court is therefore unable to construe plaintiff's assertion of violations of the ADA and Rehabilitation Act as stating a valid claim.

When only state claims remain after dismissal of other claims in a federal action, courts should generally decline to exercise pendant jurisdiction over those claims. 28 U.S.C. § 1367(c); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state

---

[4] With respect to the Rehabilitation Act, plaintiff states only generally that she "believes that the wrongs, injuries and discrimination that she has detailed throughout this pleading are violations under Section 503 of the . . . Act." (Am. Compl. at 27.)

claims should be dismissed as well."); *Phillips v. City of New York*, No. 12-CV-237 (WFK) (LB), 2014 WL 2547584 (E.D.N.Y. June 5, 2014) *aff'd*, 775 F.3d 538 (2d Cir. 2015). Therefore, having found that plaintiffs federal claims must be dismissed, the Court declines to exercise pendant jurisdiction over the remaining New York State Mental Hygiene Law claims.

## CONCLUSION

Plaintiff's original claims against each of the named defendants were dismissed in the Court's June 19, 2013 Order. The Amended Complaint, now before the Court, fails to cure the deficiencies in the original complaint, as it does not name any individual defendants who may be held liable under Section 1983. Plaintiff's new claims under the ADA and the Rehabilitation Act also fail to state a claim and must be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B).

In light of plaintiff's *pro se* status, the Court grants plaintiff leave to file a Second Amended Complaint, limited to section 1983 claims against specific individuals and renewal of any appropriate pendant state law claims. The Second Amended Complaint must name as defendants the individuals whom she believes to be responsible for the alleged deprivation of her rights and identify how each of these individuals' actions or omissions caused the alleged deprivation. If plaintiff cannot identify the individuals by name at this time, she may name "John Doe" defendants and provide a physical description for each, along with his or her place of employment and any other identifying details that she can provide.

Plaintiff shall have thirty (30) days from the date of this Order to file a Second Amended Complaint. The Second Amended Complaint must be labeled "Second Amended Complaint" and bear the same docket number as this Order. No summonses shall issue at this time, and all further proceedings shall be stayed for 30 days. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal taken from this order would not be taken in good faith, and therefore

*in forma pauperis* status is denied for purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

The Clerk of Court is directed to mail a copy of this Memorandum and Order to plaintiff *pro se* and note the mailing on the docket.

                                                      SO ORDERED.

*Roslynn R. Mauskopf*

Dated: Brooklyn, New York
       August 10, 2015                              _____
                                                        ROSLYNN R. MAUSKOPF
                                                        United States District Judge